ORDERED.

**Dated:  May 10, 2017**

K. Rodney May
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re

FIDDLER'S CREEK, LLC, ET AL.,                    Case No. 8:10-bk-03846-KRM
                                                 Chapter 11
        Debtors.

_____/

FIDDLER'S CREEK, LLC, ET AL.,

        Plaintiffs/Counter-Defendants,

v.                                               Adv. No. 8:11-ap-0809-KRM

PEPI CAPITAL, L.P.,

        Defendant/Counter-Plaintiff and
        Third-Party Plaintiff.

_____/


**MEMORANDUM OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT
(DOC. NOS. 84, 106 AND 113)**

        The issue before the Court, on cross motions for summary judgment, is whether it was

the lender, PEPI Capital, L.P. ("PEPI"), or the borrowers, Fiddler's Creek, LLC, and its 27

subsidiaries (collectively, the "Debtors"), who defaulted under a pre-Chapter 11 loan

commitment.  Debtors obtained the written commitment in January 2010 (the "Commitment

Letter") to be able to fund operations in the Chapter 11 cases that they later filed, on February

23, 2010.  Debtors paid PEPI one-half ($405,000) of the commitment fee and $550,000 for

PEPI's legal expenses.  The parties began negotiating the terms of the final loan documents.

Some three and a half weeks later – after at least five drafts of the loan documents were prepared

by PEPI, and with the time for the bankruptcy filings approaching − the loan documents were not

in conformity with the Commitment Letter.

The Debtors' owner, Aubrey Ferrao,[1] then decided to fund post-petition operations

himself and, four days later, Debtors sent a letter (the "Default Letter") alleging multiple defaults

by PEPI and demanding return of the $405,000.  The next day, February 23, 2010, Debtors filed

28 Chapter 11 petitions; the day after that, they filed an emergency motion to approve a

$25 million post-petition credit facility from Gulf Bay Capital, Inc. ("Gulf Bay"), a company

owned by Mr. Ferrao.

PEPI filed a $1.4 million claim in the Chapter 11 cases, which Debtors are obligated to

pay in full if it is allowed.[2]  The claim is based on this provision of the Commitment Letter:

> "*All indemnities and obligations of the* [Debtors] **shall survive the termination** *of
> this Commitment Letter or the commitment of PEPI hereunder,* **provided however,
> such indemnities and obligations shall not survive in the event of a default by
> PEPI hereunder.**"[3]

Relying on the same provision, and alleging that PEPI defaulted, Debtors filed this adversary

proceeding objecting to PEPI's bankruptcy claim and seeking recovery of all pre-petition

payments.

---

[1] Mr. Ferrao is the founder, CEO, and principal owner of Fiddler's Creek, LLC.

[2] PEPI filed identical claims in each of the Debtors' 28 cases, each in the amount of $1,405,000.  Main Case, Claim No. 204.  The claim consists of the second half of the commitment fee, $405,000, and a "break up" fee of $1 million.  Main Case, Doc. No. 1134.

[3] Lorio Dep. Ex. 15 at 6 (emphasis added).

The Court has under consideration Debtors' Motion for Partial Summary Judgment on Counts I and II of the Complaint,[4] as well as Debtors' Supplement thereto, PEPI's Response, and Debtors' Reply.[5] The Court also has under consideration PEPI's Motion for Partial Summary Judgment and Debtors' Response.[6]  The Court has considered the submitted exhibits, the affidavit of Jeffrey Fine, PEPI's lead counsel, the deposition testimony of other witnesses, the cases cited, and the arguments advanced by counsel.

For the reasons stated below, the Court concludes that PEPI did breach its obligations under the Commitment Letter because, with knowledge of the Debtors' imminent need to file Chapter 11 petitions, PEPI (1) repeatedly declined to incorporate certain lien enforcement restrictions into the loan documents, as required by the Commitment Letter, and (2) refused to provide a written confirmation that its due diligence investigation had been satisfactorily completed before Debtors filed their Chapter 11 petitions.  Thus, Debtor's motion for partial summary judgment is due to be granted.  PEPI's motion for summary judgment will be denied.

---

[4] Count I: Breach of Contract

 Debtors assert that PEPI breached the Commitment Letter by: (1) materially altering the terms of the Commitment Letter, (2) deleting and redrafting critical provisions required to be in the loan documents, and (3) failing to comply with the due diligence sign off requirement under the Commitment Letter.  Debtors request the Court enter a judgment against PEPI in the amount of $955,000 (the amount of the commitment fee paid to PEPI), plus interest.

Count II: Breach of Implied Covenant of Good Faith and Fair Dealing

 Debtors assert that PEPI acted in a way that prevented Debtors from receiving the benefit of the contract, and that judgment should be entered against PEPI in the amount of $955,000, plus interest.

[5] Doc. Nos. 84 (Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law, the "Motion"), 100 (PEPI's Response in Opposition to Debtors' Motion for Partial Summary Judgment, the "Response"), 102 (Debtors' Reply to PEPI's Response in Opposition), and 113 (Supplement to Debtors' Motion for Partial Summary Judgment).  Initially, PEPI requested an affirmative ruling in its Response to Debtors' Motion for Partial Summary Judgment.  Later, on March 20, 2015, PEPI filed its own Motion for Partial Summary Judgment (Doc. No. 106).

[6]  Doc. Nos. 106 (PEPI's Motion for Partial Summary Judgment and Incorporated Memorandum of Law) and 114 (Debtors' Response to PEPI's Motion for Partial Summary Judgment).

## FACTUAL BACKGROUND

Overview

Fiddler's Creek, LLC, was the developer of a large planned community near Naples,

Florida.  The "Fiddler's Creek" development encompassed nearly 4,000 acres, including:

unplatted parcels with no infrastructure; developed neighborhoods requiring maintenance; a

championship golf course; a marina; Gulf Coast condominiums; and homes under construction.

Much of the real estate was encumbered by liens for multiple series of bonds issued by two

Community Development Districts (the "CDD's").  Some parcels were also encumbered by

separate mortgages held by eight lenders (the "Pre-Petition Lenders").

Debtors plausibly assert that they were compelled to seek Chapter 11 relief after the real

estate crisis in 2008 severely impacted their cash flow.  In turn, they determined that they would

need a credit facility to fund operations after the Chapter 11 filings (a transaction commonly

referred to as a debtor-in-possession loan, or "DIP Loan").[7]

Through the fall of 2009 and January of 2010, the parties negotiated the terms of the

Commitment Letter and a term sheet.[8]  The Commitment Letter was signed on January 27, 2010,

but dated as of December 31, 2009.  It called for PEPI to provide up to $27 million, to be drawn

as needed in accordance with an 18-month budget.[9]  The DIP Loan was to be secured by a first

mortgage on all of the Debtors' assets.  As to some parcels, this lien would "prime" the existing

---

[7] 11 U.S.C. § 364.  Unless otherwise stated, all statutory references are to the Bankruptcy Code, 11 U.S.C. §§ 101 *et seq*.

[8] On October 29, 2009, the Debtors entered into a term sheet with Petrus Private Investments, L.P., which later changed its name to PEPI Capital, L.P.

[9] Blasnick Dep. Ex. 2 at 7.

mortgages of the Pre-Petition Lenders.[10]  The parties anticipated that the initial borrowing would be about $2 million.[11]  The Commitment Letter incorporated a final term sheet and multiple due diligence checklists.

PEPI was to provide the DIP Loan documents, as to which the Commitment Letter required:

> "*The terms and conditions of the documentation of the Credit Facility shall be **substantially the same** as those set forth herein and in the Term Sheet and such documentation shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein.*"[12]

For nearly three weeks, the parties engaged in numerous email exchanges and conference calls to address substantive issues.  The Debtors worked with PEPI to clear the numerous items on the due diligence checklists.[13]

Ultimately, the parties were unable to agree on whether certain provisions of the Commitment Letter, particularly those that would restrict the lender's enforcement of its real estate liens after a default, could be omitted from the loan documents or restated in terms that materially differed from the Commitment Letter.

<u>The Commitment Letter and the Parties' Negotiations</u>

The Commitment Letter called for an escrow mechanism (the ***"Escrow Provision"***) by which consent foreclosure judgments and deeds in lieu of foreclosure would be held in escrow,

---

[10]  Under 11 U.S.C. § 364(d), the bankruptcy court may authorize a debtor in possession to incur debt that is secured by a senior lien on property of the estate that is already subject to an existing lien, provided certain conditions are met. In particular, there must be no other available credit and sufficient proof that there is adequate protection – typically a demonstrable equity cushion – to protect the liens that are being primed.

[11]  Lorio Dep. Ex. 19 (email from Mr. Fine to Mr. Battista, January 15, 2010).

[12]  Lorio Dep. 110:9−111:4; Blasnick Dep. 49:11−50:9; Blasnick Dep. Ex. 2 at 4 (emphasis added).

[13]  *See, e.g.,* Doc. No. 105 at 6 (email from Ms. Houk to Ms. Helm, copying Jeff Fine and others, regarding due diligence check list, Monday, February 15, 2010 at 2:11 pm).

with a related "valuation mechanism" to establish credits to reduce the debt as the properties

were acquired by PEPI from the escrow:

> "[T]*he final loan documentation for the Credit Facility shall provide (i) for an escrow mechanism to hold consent judgments to any foreclosure in the order of priority in the waterfall below to speed the judgment and foreclosure process, and (ii) for deeds in lieu of foreclosure to be held in escrow, and (iii) for a valuation mechanism so that if property is acquired through a deed that the debt is reduced accordingly.*"[14]

The Commitment Letter also established an agreed sequence by which PEPI would

collect its debt from the mortgaged real estate (the ***"Waterfall Provision"***):

> "[T]*he final loan documentation for the Credit Facility shall provide that* [PEPI, as] *the Agent and Lender agrees* [sic] *that it **will not foreclose** on real property described in a numbered item in the following list **unless it has previously used commercially reasonable efforts to first collect out of the property described in the numbered items before it in the below list.***"[15]

PEPI's commitment was subject to several conditions, including its "completion of and

reasonable satisfaction in all material respects with a due diligence investigation of the [Debtors]

. . . ."[16]  According to the supporting affidavit of Attorney Fine, PEPI and its team "methodically

completed" the dozens of items on the due diligence checklists.[17]

PEPI's obligation to lend was stated to expire on February 8, 2010, less than two weeks

after the parties signed the Commitment Letter.[18]  That deadline would be reset, however, to a

---

[14]  Blasnick Dep. Ex. 2 at 13.

[15]  *Id.* (emphasis added).  The Waterfall Provision specifies the order of priority in which lien enforcement rights could be taken against the collateral: (1) cash on hand and personal property; (2) unencumbered condo units owned by FC Hotel, Ltd.; (3) unencumbered platted lots and undeveloped land owned by GB Peninsula, Ltd., and 951 Holding, Ltd.; and (4) the remaining finished developed land lots owned by Debtor, GBFC Development, Ltd., and all finished housing units owned by Fiddler's Creek, LLC, its subsidiaries, and GB Peninsula, Ltd.  *Id.  See* Fine Aff. at ¶ 10.

[16]  Blasnick Dep. Ex. 2 at 3−4.

[17]  "[T]he due diligence review and closing process was extensive, . . . ongoing in nature, and continuously updated upon the completion of each item."  Fine Aff. at ¶15.

[18]  Blasnick Dep. Ex. 2 at 4.

date that was three business days after PEPI notified Debtors that its due diligence investigation

was complete; Debtors could then extend PEPI's funding obligation by another 90 days by filing

their Chapter 11 petitions within that three-day period:

> "*The obligations of* [PEPI] *to provide the Credit Facility under this Commitment Letter if timely accepted and agreed to by the* [Debtors]*, will terminate upon the earlier to occur of: 1) the closing of business on February 8, 2010 (or such later date that is 3 business days after* [PEPI] *has advised* [Debtors] *that it has completed its due diligence), unless the* [Debtors have] *instituted the Bankruptcy Cases on or before that date, and 2) 90 days after the filing of the Bankruptcy Cases unless the . . . Bankruptcy Court overseeing the Bankruptcy Cases has entered an interim order or final order authorizing and approving the Credit Facility on or prior to such date.*"[19]

On January 27, 2010, after the Commitment Letter was signed, Paul Battista (Debtors'

lead attorney) sent the following inquiry to Attorney Fine:

> "*Jeff, thank you for all of your help in getting us to this point.  I assume that you and your team are now commencing due diligence in earnest so that we can get to the filing in the next several days.  Please let us know what we still need to get to you in order to keep the process moving.*"[20]

The Escrow Provision was included, in part, in PEPI's first draft of the loan documents,

circulated on February 2, 2010.[21]  So, too, was the Waterfall Provision.  Section 10.4 of the draft

loan agreement provided that PEPI's "rights and remedies" against any parcel of real estate be

restricted to using "*commercially reasonable efforts to exercise its rights with respect to each*

*piece of the Reserved Collateral in the order in which it is listed* [in the Waterfall] *before*

*commencing the exercise of its rights against the next piece of* [collateral]."[22]

---

[19]  Blasnick Dep. Ex. 2 at 4 (emphasis added).

[20]  Lorio Dep. Ex. 15 (email from Mr. Battista to Mr. Fine, January 27, 2010 at 4:13 pm).

[21]  *See* Lorio Dep. Ex. 16.

[22]  *Id*. at 55.

On February 5, 2010, Mr. Battista asked Mr. Fine for an "*update on the status of the due diligence and the expected completion date.*"[23]  On February 8, the initial expiration date, Mr. Battista repeated this request:

> "*1. We understand that you are conferring with your team so as to let us know whether you are able to provide the due diligence sign off, and if more information is needed, then what you need from us in order to make the decision.*
>
> *2. We understand that you are conferring with your team to provide us with an updated due diligence/conditions precedent checklist so that we can have everything ready to go for a closing as soon as the court enters the interim order. Our client will need to borrow under the interim facility literally the day or two after the hearing, which means by the end of next week.*"[24]

Mr. Battista also reminded Mr. Fine of the need to "*build in the concept of a valuation mechanism for purposes of reduction of the debt through the foreclosure or deeds in lieu.*"[25]

Two days later, on February 10, Mr. Battista advised Mr. Fine that Debtors were ready to file for Chapter 11 by February 11, 2010, and would need to receive the initial loan advance around February 19:

> "*Jeff, is it realistic that we can file tomorrow with due diligence sign off and revised loan agreement/ interim order* [from the bankruptcy court] *so that we can get to a closing end of next week?  I have the petition etc ready to go . . . .*"[26]

In the morning of February 11, Mr. Battista asked Mr. Fine to add "*the language per the commitment letter on a valuation mechanism in respect of the deeds in lieu of foreclosure under the waterfall.*"[27]  But, that afternoon, Mr. Lorio (PEPI's private investment analyst) emailed Mr.

---

[23] Fine Dep. Ex. 43 (email from Mr. Battista to Mr. Fine, February 5, 2010 at 6:36 pm).

[24] Fine Dep. Ex. 44 (email from Mr. Battista to Ms. Houk and Mr. Fine, February 8, 2010 at 2:24 pm).

[25] *Id.*

[26] Fine Dep. Ex. 45 (email from Mr. Battista to Mr. Fine, February 10, 2010 at 6:22 pm) (emphasis added).

[27] Radunsky Dep. Ex. 30 (email from Mr. Battista to Mr. Fine and Ms. Houk, February 11, 2010 at 10:07 am).

DiNardo (Debtors' CFO) advising of PEPI's decision to remove the Escrow Provision and

valuation mechanism from the documents:

> ". . . [w]*e do not need these, and to get this moving and avoid complexity propose deleting this in* [sic] *the structure entirely.*"[28]

Later that day, Mr. DiNardo (for Debtors) expressed concern about PEPI's

proposed deviations from the Commitment Letter:

> "*A. The language to the Waterfall that has been set forth in the Commitment Letter has been diluted and is less clear.  The language that is in the Commitment Letter works.*
>
> *B. The Deed in Lieu in escrow concept only works with respect to the unencumbered property because of valuation issues associated with the mortgage lenders' liens.*
>
> *C. You need a valuation method for the Waterfall.  One acceptable method would be to get an updated appraisal by Integra at that time.  Jeff Fine seemed to be okay with this solution – at least initially on the call.*"[29]

PEPI nevertheless removed the Escrow Provision from the next draft of the loan

documents.  This draft also included a revised Section 10.4, which deleted the phased exercise of

all rights against the collateral and added:

> "*Lender shall use commercially reasonable efforts to effect a foreclosure sale of such assets in the order listed on Exhibit E and shall use commercially reasonable efforts not to effect such a foreclosure sale of any asset listed thereon until Lender's Lien on the asset listed prior to such asset has been foreclosed, provided, that Lender shall not be prevented from commencing foreclosure proceedings against any asset listed on Exhibit E prior to the foreclosure sale of an asset listed prior thereto.  As an example, Lender may file a foreclosure suit against all of the Real Property but would use commercially reasonable efforts to have foreclosure sales thereon occur in the order of the assets set forth on Exhibit E.*"[30]

---

[28] Lorio Dep. Ex. 17 (email from Mr. Lorio to Mr. DiNardo, February 11, 2010 at 5:02 pm).

[29] Lorio Dep. Ex. 18 (email from Mr. DiNardo to Mr. Lorio, February 11, 2010 at 6:10 pm).

[30] Doc. No. 103 at 160−61 (email from Ms. Helm to Mr. Desiderio and Mr. Fine, copying others, February 11, 2010 at 9:13 pm, with revised draft attached) (emphasis added).  Fine Dep. 142:9-20; Lorio Dep. 112:11−15, 113:11−114:15, 119:6−120:21.

On February 15, Mr. Battista inquired of Mr. Fine: "*Jeff, we are getting really close* [to filing Chapter 11] . . . .*we need to know when we can get the due diligence sign off.*"[31]  Later (at 11:41 p.m.), Mr. Battista asked Mr. Fine: "*Any word on the title due diligence or the budget sign off?*"[32]  Attorney Battista also made the following proposal in an effort to buy time for the parties to resolve their dispute over the lien enforcement structure:[33]

> "*All, pursuant to our call on Friday morning, we have worked through the weekend to come up with a firm proposal on the foreclosure and valuation issue for the waterfall.*
>
> *First, in an effort to move things along, we are ok pursuing the interim order* [from the bankruptcy court] *without a resolution on this issue.  Rather, we will rely on the 'commercially reasonable' language for the waterfall and argue to the court that the* [Pre-Petition Lenders] *do not need the valuation mechanism for the interim order.*
>
> [W]*e propose that the valuation/foreclosure be structured as follows: PEPI would (i) obtain a blind appraisal establishing the fair market value of any collateral as to which it initiates a foreclosure action prior to such action, (ii) not foreclose on any collateral (the 'Identified Property') if the value of the other collateral listed prior to such Identified Property in the waterfall list exceeds 150% of the outstanding amount owed to PEPI, and (iii) credit the Debtors against their outstanding obligations the fair market value of all collateral acquired by PEPI.*"[34]

PEPI did not agree to the proposed valuation structure.[35]  The very next day, February 16, 2010, Mr. Lorio (for PEPI) advised Mr. DiNardo (for Debtor):

---

[31]  Radunsky Dep. Ex. 28 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 7:07 pm).

[32]  Radunsky Dep. Ex. 29 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 11:41pm).

[33]  Lorio Dep. Ex. 21; Lorio Dep. 143:15−144:4; Fine Dep. 129:6−25.

[34] Lorio Dep. Ex. 21 (email from Mr. Battista to Mr. Fine, February 15, 2010 at 11:23 am).  The valuation mechanism for deeds in lieu would apply to real estate that was not subject to the mortgages of the Pre-Petition Lenders.  The Debtors argued with PEPI that these provisions and the Waterfall Provision were needed to assure the Pre-Petition Lenders that their collateral was a last resort.

[35]  Fine Dep. 130:10−131: 17.

"*We probably need to discuss the waterfall and where we are on that.  I think* ***there is not agreement right now on how we would work through collateral in a*** ***foreclosure process.***"[36]

Mr. Lorio sent Mr. DiNardo and Attorney Houk an email (at 5:28 pm) in which he requested a conference call "*to go over the suggested changes to*" the latest draft.[37]

The conference call took place in the evening of February 16.  The parties discussed the Escrow Provision and the revised Waterfall Provision.[38]  PEPI's representatives advised that PEPI would not agree to the valuation mechanism or add the Escrow Provision to the final loan documents.[39]  In his deposition, Mr. Lorio (for PEPI) testified that PEPI's representatives advised that PEPI would not bind itself to the foreclosure valuation structure that Mr. Battista proposed in his February 15 email:

"*A:      ...Yes, we told him that was not − I − my recollection is, I believe, we conveyed to* [Mr. Battista] *that that was not acceptable but that there would be a mechanism that would be acceptable.*
*Q:      And in that February 16, 2010 conference call, did PEPI also state to Mr. Battista that the loan documents for the time being were not going to incorporate any language that effectuated the first "in addition" sentence* [from his February 15 email]*?*
*A:      I think we may have.  I don't know if it was said exactly like that but I think we may have conveyed that understanding.*"[40]

PEPI's representatives also advised Debtors that it would not provide a written due diligence sign-off until the time came for making an advance under the DIP Loan, which could not occur until after the Chapter 11 cases were commenced and the bankruptcy court had

---

[36] Lorio Dep. Ex. 19 (email from Mr. Lorio to Mr. DiNardo, February 16, 2010 at 12:50 pm) (emphasis added).

[37] Lorio Dep. Ex. 22 (email from Mr. Lorio to Mr. DiNardo and Ms. Houk, February 16, 2010 at 5:28 pm).

[38] Fine Dep. 125:21−24, 135:14−24, 136:22−25, 137:1−4.

[39] Fine Dep. 132:17−133: 4; 135:14−137: 4.

[40] Fine Dep. 136: 18−139: 4.

approved the borrowing.[41]  In his deposition, Mr. Lorio testified that Debtors were told that PEPI would not provide a written due diligence sign-off "*because due diligence is never completed until you close.*"[42]  Mr. Lorio went on to state that: "*I think we told them that we would not be signing a due diligence letter, but we would complete* [sic] *with our due diligence.*"[43]

In the morning of February 17, Mr. Battista advised Mr. Fine that Debtors were ready to file for Chapter 11:

> "*I also understand that there was another call last night on the loan agreement and that good progress was made.  I am also told another version is being circulated this morning reflecting the changes.  Assuming this is now complete, I think the only item remaining for us to be comfortable filing is your client's sign off on the due diligence, including related to the title issues.*
>
> *Please let me know as we are prepared to file today as soon as we have these last pieces together.*"[44]

Later that afternoon, Attorney Helm sent out the next draft of the loan agreement; neither the Escrow Provision nor a valuation mechanism were included.[45]  This draft again included the provision that would permit PEPI to obtain a single foreclosure of Debtors' interests in all of the mortgaged properties.[46]

Later on February 17, Mr. Battista complained to Mr. Fine that:

> "*There are several things in the commitment letter that were heavily negotiated, carefully chosen and agreed upon and yet have either changed or been eliminated in their entirety. . . .*"[47]

---

[41] Fine Dep. 135:14−24, 136:13−137:5; Fine Dep. Ex. 19; Lorio Dep. 149: 24−150:8; Radunsky Dep. 97:3−14.

[42] Lorio Dep. 149:9−11.

[43] Lorio Dep. 150:6−8.

[44] Doc. No. 105 at 8 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 8:22 am).

[45] Fine Dep.139:19−140:3; Lorio Dep. 155:8−15, 156:1−3; Radunsky Dep. 128:19−129:7, 129:21−25, 130:1−7; Lorio Dep. Ex. 23.

[46] Fine Dep. 141:12−142:20.

[47] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

This complaint was in an email seeking revision of a provision obligating Debtors to pay a

$1 million "break up" fee in the event that PEPI withheld funding for any reason which would

force Debtors to seek funds from another lender:

> *"I am trying to address an issue that is a real issue and one that is sure to come up. If you are telling me that your client is unwilling to consider the issue and attempt to resolve and address it, which we think would be the reasonable thing to do, then please tell me that. I do not think there are any scenarios that I am concerned about. My sole concern is that your client refuses to fund after we get the final order for any reason (whether it is failure of title, failure of conditions etc etc) and we are able to get one of the other lenders to step up and fund notwithstanding the issue that prevented your client from funding, then it is pretty clear to us at least that no break up fee should be due and certainly not one at 25%."[48]*

The next day, February 18, Mr. Battista sent the following query to Mr. Fine: "*Any update? The*

*day is beginning to get away from us in terms of filing.*"[49]

The attorneys also continued to discuss another provision of the Commitment Letter,

referred to as the "***Purchase Option:***"[50]

> *"The Company and/or any of its affiliates or principals shall have the right, exercisable for thirty calendar days beginning upon occurrence of the Maturity Date, to acquire the Loan from Agent and Lenders for a cash payment in an aggregate amount equal to the sum of the then outstanding principal indebtedness, accrued but unpaid interest thereon to the date of purchase, plus any and all fees, costs and expenses due and owing by the Company under the Loan, including, without limitation, all fees, costs and expenses that would be earned upon payment in full of the outstanding balance of the Loan. **Upon exercise of the Purchase Option, the Company and the Guarantors shall provide a written general release of all claims** to the Agent and Lenders in form reasonably acceptable to Agent, and Agent and Lenders will quit claim and assign to purchaser without recourse, representation, or warranty whatsoever all of Agent's and Lender's right, title and interest under the Loan, and all collateral*

---

[48] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

[49] Fine Aff. Composite Ex.3 (email from Mr. Battista to Mr. Fine, February 18, 2010 at 10:37 am).

[50] These emails are attached as composite exhibit 3 to Mr. Fine's affidavit.

*and other supporting obligations.  The terms of the Purchase Option shall be reflected in the organic Loan Documentation.*"[51]

The right to purchase the loan after a default was important to Mr. Ferrao, who was sensitive to PEPI being able to declare a default and then taking over the Debtors' assets − a strategy employed by some lenders that is referred to as a "loan-to-own."[52]  The Debtors proposed deleting the grant of a general release, as required in the Commitment Letter, because of a concern that the bankruptcy court might not allow it, which could void the Purchase Option.[53]  Attorney Houk (for Debtors) proposed the alternative of an agreement by the purchaser of the loan to indemnify PEPI, which obligation would be secured by a collateral assignment of all of the purchased loan documents and lien rights.[54]

The Court surmises that the difference between giving PEPI a general release and being indemnified was significant.  If PEPI ever declared Debtors to be in default and refused to make further advances, Debtors would have the option, in the absence of the general release, of asserting lender liability claims against PEPI.  The indemnification proposal would have left PEPI exposed to that risk and PEPI rejected it later that afternoon.[55]

In the evening of February 18, 2010, Mr. Ferrao decided to provide the DIP financing himself, through Gulf Bay, after meeting with his CFO, Mr. DiNardo.  Mr. Ferrao decided to make the DIP Loan because: (1) Debtors had run out of money to meet payroll; (2) Debtors

---

[51] Blasnick Dep. Ex. 2 at 21 (emphasis added).

[52]  Ferrao Dep. 143:3−144:11.

[53] Attorney Houk advised PEPI's attorney on Thursday, February 18, that "*there may be an issue with the Bankruptcy Court approving general releases executed by the Obligors.*"[53]  Doc. No. 90, Composite Ex. 3 (email from Ms. Houk to Ms. Helm, Mr. Battista and Mr. Fine, February 18, 2010 at 2:58 pm).

[54] Doc. No. 90, Composite Ex. 3 (email from Ms. Houk to Ms. Helm, Mr. Battista and Mr. Fine, February 18, 2010, at 2:58 pm).

[55] Doc. No. 90, Composite Ex. 3 (email from Mr. Springfield to Tony DiNardo, February 18, 2010, at 4:35 pm).

could not get the due diligence sign-off from PEPI and they could not file bankruptcy without a

committed lender; and (3) there were unresolved issues with the waterfall.[56]

The parties had no further discussions on Friday, February 19, causing Mr. Springfield

(an officer of PEPI's general partner) to ask Mr. DiNardo at 4:14 p.m.: "*What's up with the radio*

*silence?*"  To which Mr. DiNardo replied, at 4:27 p.m.: "*We are conferring with counsel and will*

*get back to you as soon as we can.*"[57]

On Saturday, February 20, Mr. Lorio (for PEPI) emailed Mr. DiNardo:

> "*Tony, the dearth of communication at this stage is disconcerting to us.  I was*
> *hoping we had good lines of communication to address and resolve issues in*
> *manner that this loan could be approved and executed.  Can we set a time to have*
> *a call tomorrow* [Sunday] *to go through the issues you have or what other*
> *decisions you have made.*"

*          *          *

> "*KL Gates* [PEPI's lawyers] *and we have suspended all work on this loan.*"[58]

<u>The Default Letter</u>

The requested conference call did not occur.  Instead, on Monday, February 22, Mr.

Battista sent the Default Letter to Mr. Fine, asserting that:

> "*. . . PEPI has defaulted under the terms of the Commitment Letter for several*
> *reasons, including (i) the stated refusal by PEPI to provide Fiddlers with notice*
> *that PEPI has completed its due diligence in connection with the Loan, and (ii)*
> *the decision by PEPI to delete from the loan documents those certain critical*
> *provisions of the waterfall required by the Commitment Letter concerning an*
> *escrow for deeds in lieu of foreclosure and consent judgments, and, most*
> *importantly, the valuation mechanism related to the foreclosure of the collateral*
> *securing the Loan in respect of the waterfall.  PEPI also materially modified the*
> *terms of the Commitment Letter in respect of the waterfall by providing in the*
> *loan documents that PEPI had the right to foreclose and obtain foreclosure*

---

[56] Ferrao Dep. 41:10−42:9.

[57] Lorio Dep. Ex. 24.

[58] Lorio Dep. Ex. 25.

*judgments on all of the collateral within the waterfall at the same time, relegating the waterfall concept solely to the foreclosure sales process.*"

\*       \*       \*

"*Notwithstanding, during a phone conference call that took place during the early evening on Tuesday, February 16, 2010, representatives of PEPI for the first time unequivocally stated that PEPI would not be providing notice of the completion of its due diligence until, at the earliest, at the time of the closing of the Loan.  As a result of such position, which is contrary to the provisions of the Commitment Letter and the clear understanding of the parties, Fiddlers was faced with the prospect of filing the chapter 11 cases without the benefit of knowing whether PEPI had completed its due diligence and therefore whether PEPI was prepared to make the Loan.*"[59]

The Debtors filed 28 Chapter 11 petitions the next day, February 23, beginning around noon.[60]

<u>PEPI's Response</u>

Later on February 23, Mr. Fine provided PEPI's response:

"*Although PEPI has told you repeatedly during this past week that the* [Debtors] *are free to file Chapter 11 at any time, please consider this **your formal 3 business day notice** that due diligence has been completed.*"[61]

In paragraph 4, Mr. Fine stated that (i) "*. . . PEPI will certainly review your proposed provision*" dealing with the consent judgments and (ii) "*. . . even though PEPI does not require it, then PEPI will promptly review deed in lieu language and will negotiate the provisions of a valuation mechanism for deeds in lieu of foreclosure and will include them in the Loan documentation.*"[62]  And, in paragraph 5, Mr. Fine stated that PEPI "*will diligently review the*

---

[59] Blasnick Dep. Ex. 5.

[60] *See* Radunsky Dep. Ex. 33 (email from Mr. Battista to Mr. Fine, February 23, 2010 at 5:37 pm).

[61] Blasnick Dep. Ex. 6 at ¶ 3 (emphasis added).

[62] *Id.* at ¶ 4.

*wording of the waterfall provisions as you think are compatible with the terms of the Commitment Letter.*"[63]

The Gulf Bay Loan

Gulf Bay gave its $25 million commitment to the Debtors on February 23, 2010, the Chapter 11 petition date.  Debtors filed an emergency motion the next day seeking approval of the loan (the "Gulf Bay Loan").[64]

The Gulf Bay Loan required first mortgages on several parcels that would be senior to those of the Pre-Petition Lenders.[65]  The loan documents included a "waterfall" for the sequential liquidation and foreclosure of collateral.[66]  The Gulf Bay Loan did not require either an escrow provision or a valuation mechanism.[67]  The commitment fee was $500,000, compared to the $810,000 required by PEPI.  The foreclosure process, in the event of default, permitted a single foreclosure judgment.[68]  There was no need for a purchase option or any due diligence investigation.

On March 3, 2010, Mr. Ferrao appeared at the hearing on approval of the first Gulf Bay advance.  He testified that he was not aware of anybody else who would make this type of loan on comparable or better terms.[69]  When asked if Gulf Bay would be willing to withdraw if there was an alternative lender willing to make advances on the same terms, Mr. Ferrao answered

---

[63] Blasnick Dep. Ex. 6 at ¶ 5.

[64] Main Case, Doc. No. 10.

[65] Main Case, Doc. No. 10-1 at ¶ 8.

[66] *Id.* at ¶ 14.

[67] *Id.*

[68] *Id.*

[69] Blasnick Dep. Ex. 8 (Hearing Transcript, March 3, 2010, at 214-215).

affirmatively – "*in a New York second.*"[70]   The Court approved the Gulf Bay Loan, by multiple interim orders, premised on a showing of sufficient equity in the real estate to adequately protect the Pre-Petition Lenders.

Some eighteen months later, the Debtors successfully reorganized by confirming Chapter 11 plans, facilitated by $45 million of exit financing from a third party.[71]   The outstanding balance of the Gulf Bay Loan was fully repaid.   The Debtors' Chapter 11 plans were supported by the CDD's, the Pre-Petition Lenders, general unsecured creditors, and the golf club members. Among other things, the Debtors agreed to pay all allowed unsecured claims in full.   Thus, PEPI will be entitled to $1.4 million if its claim is allowed.[72]

## ANALYSIS

A. Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that no genuine issue of material fact exists, and that it is entitled to judgment as a matter of law."[73]   "The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists.   A "genuine" dispute means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[74]   Once the moving party has met its burden, the non-movant must set forth specific facts

---

[70] Blasnick Dep. Ex. 8 (Hearing Transcript, March 3, 2010, at 214-215).

[71] Main Case, Doc. Nos. 1442 at 30 (Memorandum Opinion and Order Confirming the Debtors' Second Amended Plans of Reorganization as Modified) and 1279 (Notice of Filing Plan Supplement to the Second Amended Plan of Reorganization Filed on March 18, 2011).

[72] Main Case, Doc. Nos. 504-14 (Chapter 11 Plans of Reorganization), 515 (Consolidated Disclosure Statement), 661-72 (First Amended Chapter 11 Plans), 708 (Second Consolidated Disclosure Statement), 752 (Second Amended Consolidated Disclosure Statement), 754-64 (Second Amended Chapter 11 Plans), 1210-14, 1216-17 and 1238-39 (Modified Amended Chapter 11 Plans), 1442 (Memorandum Opinion and Order Confirming Chapter 11 Plans, as Modified), 1927-28 (Orders Dismissing Appeals of Confirmation Order, entered on April 25, 2012 by Judge Scriven).

[73]  Fed. R. Civ. P. 56(a) is made applicable to bankruptcy proceedings by Fed. R. Bankr. P. 7056.

[74]  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).

showing there is a genuine issue for trial.[75]  "It is permissible for a trial court in a non-jury case to grant summary judgment if witness credibility is not at issue and trial would not enhance the court's ability to draw inferences and conclusions."[76]

For summary judgment, the non-moving party is given the benefit of the doubt on credibility issues and all justifiable inferences are to be drawn in favor of the non-moving party.[77]  The factual conflicts relied on by the non-moving party must be both genuine and material.[78]  A properly supported summary judgment motion will not be defeated by merely colorable evidence that is not significantly probative.[79]  In determining entitlement to summary judgment, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."[80]

As a preliminary matter in this proceeding, PEPI asserts that Debtors are not entitled to summary judgment because they did not claim any damages and did not produce any evidence

---

[75]  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 10 S. Ct. 1348 (1986); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993).

[76]  *In re French*, 2012 WL 1166248, *4 (M.D. Fla. Apr. 9, 2012); *Nunez v. Superior Oil Co.*, 572 F.2d 1119, 1124 (5th Cir. 1978).  As the Fifth Circuit explained in *Nunez v. Superior Oil Company* (which is precedent in the Eleventh Circuit under *Bonner v. Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981):

> "If a decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though the decision may depend upon inferences to be drawn from what has been incontrovertibly proved.  Under those circumstances, which may be rare, the judge who is also the trier of fact may be warranted in [drawing a conclusion] even if that conclusion is deemed 'factual' or involves a 'mixed question of fact and law.'  A trial on the merits would reveal no additional data . . . .  The judge, as trier of fact, is in a position to and ought to draw his inferences without resort to the expense of trial."

572 F. 2d at 1124.

[77]  *Official Comm. of Unsecured Creditors v. Lerner (In re Diagnostic Instrument Group, Inc.)*, 283 B.R. 87, 94 (Bankr. M.D. Fla. 2002).

[78]  *Id.* (citing *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003)).

[79]  *Dalton v. FMA Enterprises, Inc.*, 953 F. Supp. 1525, 1528 (M.D. Fla. 1997).

[80]  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).

that Debtors had performed all of their duties and obligations.[81]  But partial summary judgment

on the issue of liability for breach of contract may be entered without addressing evidence on the

issue of damages.[82]  The commentary to the 2010 Amendment of Rule 56(a) states that "[t]he

first sentence is added to make clear at the beginning that summary judgment may be requested

not only as to an entire case but also to a claim, defense, or part of a claim or defense."  Thus,

Debtors may seek partial summary judgment on the issue of PEPI's breach.

B. Debtors' Motion for Partial Summary Judgment

The parties agree that obligations under a binding loan commitment are governed by

basic contract principles.[83]  If a prospective lender breaches, for example, by conditioning the

loan closing on terms that differ from the loan commitment, the borrower may refuse to close.[84]

Likewise, a borrower may breach by refusing to close, based on a contrived dispute over the loan

terms.[85]

The Commitment Letter does not define any events of default and does not set out any

procedure for declaring a default or for providing any opportunity to cure.[86]  In the absence of

---

[81] Doc. No. 100 at 12-13 (citing *Randolph Equities, LLC v. Carbon Capital, Inc.*, 648 F.Supp. 2d 507, 520
(S.D.N.Y.2009)).

[82] *Servicios Especiales Al Comercio Exterior v. Johnson Controls*, Inc., 791 F. Supp. 2d 626 (E. D. Wis. 2011)
(holding that Rule 56(a) makes summary judgment or partial summary judgment on parts of various claims
permissible); *In re B & M Linen Corp.*, 2013 WL 3579340 (July 12, 2013 Bankr. S.D.N.Y. 2013) (granting motion
for partial summary judgment on breach of asset purchase agreement without addressing issue of damages, which
were not raised by movant in the motion for partial summary judgment).

[83] *See Freeman Horn, Inc. v. Trustmark Nat'l Bank*, 245 B.R. 820, 826 (S.D. Miss. 1999) (analyzing whether a letter
constituted a binding loan commitment letter).  *See also, Bluerack, Inc. v. Walter E. Heller & Co. of Florida*, 331
So. 2d 359, 360 (Fla. 3d DCA 1976) (finding loan commitment letters between commercial finance company and
borrowers to constitute valid enforceable contracts).

[84] *See 999 v. CIT Corp.*, 776 F.2d 866, 871 (9th Cir. 1985) (court found that the borrower was allowed to refuse
financing from lender, and find a substitute lender, based on a lender's coercive actions to force borrower to accept
a new, unjustified prepayment penalty term).

[85] *Teachers Insurance and Annuity Association of America v. Butler,* 626 F. Supp. 1229 (S.D.N.Y. 1986).

[86]  *See generally,* Blasnick Dep. Ex. 2.

express contract terms, Florida law requires that a party's nonperformance must go to the essence of the contract in order to constitute a "material" breach.[87]

### 1. The Escrow and Waterfall Provisions

The terms of the Commitment Letter were "heavily negotiated, carefully chosen and agreed upon."[88]  The Commitment Letter obligated PEPI and the Debtors to work collaboratively to prepare documents for the DIP Loan that were substantially the same as those in the Commitment Letter.  PEPI was charged with preparing the loan documents.

It is undisputed, however, that PEPI offered multiple drafts of the final loan documents (circulated on February 11, 12 and 17) that omitted the Escrow Provision and the valuation mechanism, even though each draft was preceded by Debtors' demands for incorporation of these provisions.  As the time for Chapter 11 filings drew near, PEPI's posture of omitting these lien enforcement restrictions amounted to an unmistakable signal that those terms were never going to be in the final loan documents.  The undisputed facts demonstrate that PEPI did fail, in the face of Debtors' impending need to file Chapter 11 petitions, to produce final loan documents that were substantially similar to the agreed terms of the Commitment Letter.[89]

Further, PEPI's revision of the Waterfall Provision materially deviated from the Commitment Letter's requirement of "no foreclosure" on any property without "first collecting" out of the property before it in the agreed sequence.  The Waterfall Provision that PEPI included

---

[87] *MDS (Canada) Inc. v. Rad Source Technologies, Inc.*, 720 F. 3d 833, 849 (11th Cir. 2013) (citing *Beefy Trail, Inc. v. Beefy King Int'l, Inc.*, 267 So.2d 853, 857 (Fla. DCA 1972).

[88] Fine Aff. Composite Ex. 3 (email from Mr. Battista to Mr. Fine, February 17, 2010 at 6:00 pm).

[89] The elements of a breach of contract action are (1) a valid contract; (2) a material breach; and (3) damages.  *Beck v. Lazard Freres & Co., LLC*, 175 F.3d 913, 914 (11th Cir. 1999) (citing *Abruzzo v. Haller,* 603 So.2d 1338, 1340 (Fla. 1st DCA 1992)).

in the drafts, from February 11 on, was fundamentally different.[90]  PEPI provided that it could

seek a single foreclosure judgment against all of the mortgaged real estate, adhering to the

Waterfall sequence only as to sales.[91]

PEPI argues that it never "refused" to do anything, pointing to Mr. Fine's deposition

testimony that the parties were still negotiating and that the Escrow Provision would not be in the

draft "for the time being."[92]  PEPI maintains that the Debtors and PEPI were in on-going

negotiations between February 11, 2010, and February 17, 2010, and that there were no

demands, ultimatums, or refusals on behalf of PEPI to exclude the Escrow Provision from the

terms of the DIP Loan.

Initially, PEPI's effort to persuade Debtors' management to concede these lien

enforcement restrictions was not a breach.  But, as the Debtors' cash ran out and the time for

filing Chapter 11 drew near, any other borrower would have had little choice but to capitulate.

PEPI's repeated election to tender loan documents that omitted the Escrow Provisions

and a conforming version of the Waterfall Provision did not amount to continued negotiations, as

PEPI would have the Court find.  Rather, such conduct amounted to a refusal to faithfully abide

by its agreement to incorporate these into the final loan documents.[93]  With only days remaining

before the Chapter 11 filings, PEPI understood that the parties were not in agreement "on how

[to] work through collateral in a foreclosure process."[94]

---

[90] Doc. No. 103 at 160-61 (email from Ms. Helm to Mr. Desiderio and Mr. Fine, copying others, February 11, 2010 at 9:13 pm, with revised draft attached).

[91] *Id.*

[92] Fine Depo. 136:13−137: 4.

[93] Doc. No. 102 at 23.

[94] Lorio Dep. Ex. 19 (email from Mr. Lorio to Mr. DiNardo, February 16, 2010 at 12:50 pm).

Debtors' counsel attempted to work around this dispute by offering to include only a framework in the bankruptcy court's initial order that would approve the first advance, leaving resolution to a later date.  But, PEPI declined to agree to the proposed valuation mechanism or to revise the Waterfall Provision in a matter consistent with the Commitment Letter.

PEPI was also aware, as shown by Mr. Fine's response to the Default Letter, that the parenthetical phrase in the Commitment Letter's expiration provision was a "formal" three-day notice that PEPI had completed its due diligence investigation.  This formal due diligence sign-off would have set a firm date by which Debtors would have to file for Chapter 11 to preserve the loan commitment.  It would also have established a firm date by which PEPI would have had to tender final loan documents conforming to the Commitment Letter.  Withholding the three-day trigger increased PEPI's leverage by keeping the negotiations open-ended, even as the Debtors were running out of time to file for Chapter 11.  Such conduct, reinforced by PEPI's positions stated in the February 16 conference call, constituted PEPI's failure to perform its obligations regarding the Escrow and Waterfall Provisions.[95]  PEPI's non-performance went to essential provisions of the contract.

PEPI advances four arguments to justify omitting the Escrow Provision and altering the Waterfall Provision.  The Court finds none of these arguments persuasive.

---

[95] *See, e.g., 999 v. CIT Corp.*, 776 F.2d 866, 871 (9th Cir. 1985), where the Ninth Circuit upheld the jury's verdict for the borrower, concluding that the lender's addition of a term for a prepayment penalty was not inconsequential and it was "more than reasonable for [borrower] to refuse financing from [the lender] that was subject to the new unjustified condition, and instead seek to mitigate damages by finding replacement financing:"

> "There was sufficient evidence from which to draw an inference that [the lender's agents] willfully misrepresented to [the borrower] that financing would be provided without a prepayment penalty, and acted oppressively to force [borrower] to submit to a new and onerous term.  Although the jury concluded otherwise, there was evidence, for example, that [the lender] later took advantage of [borrower's] desperate need for financing to coerce [borrower] into accepting a new prepayment penalty term."

*Id.* at 873.

PEPI first asserts that the Escrow Provision was not material because it was a "lender benefit" which it did not need and, therefore, had the right to abandon.[96]  The combined effect of the Escrow Provision, the related valuation mechanism, and the sequential foreclosure process required by the Waterfall Provision, however, would have been a significant restriction on PEPI's lien enforcement remedies.  When taken together, these provisions would have forced PEPI to accept parcels of real estate in the order of the Waterfall as actual payment (per agreed valuations) for outstanding debt (sometimes called "dirt for debt") in the event of default.[97]  No lender would like to have its remedies restricted in this way.

PEPI acknowledges that the waterfall concept was "demanded" by the Debtors and that such concept was "significant and unusual."[98]  PEPI had agreed to these restrictions when it signed the Commitment Letter.  These provisions were not solely for the benefit of PEPI who was not free to unilaterally remove or alter them.[99]

Second, PEPI contends that performance of the Escrow Provision was barred by Florida law.[100]  But, this assertion is much too broad.  One example to the contrary is *Ringling Joint Venture II v. Huntington National Bank,*[101] where the Second District Court of Appeals approved the escrow of foreclosure consent judgments.  The borrower was sophisticated and bargained for

---

[96] Doc. No. 100 at 13-14.

[97] According to the Debtors, the valuation mechanism was also for the benefit of the junior secured lenders, because it provided for the reduction of the priming loan first from property not encumbered by their mortgages.  Doc. No. 102 at 36-37.

[98] Doc. No. 100 at 5 (citing Fine Aff. at ¶ 10).

[99] *Id.* at 17.

[100] *Id.* at 15-16 (citing *Cain & Bultman, Inc. v. Miss Sam, Inc.*, 409 So. 2d 114 (Fla. 5th DCA); *Mid-State Investment Corp. v. O'Steen*, 133 So. 2d 455 (Fla. 1st DCA 1961); *Kirkland v. Miller*, 702 So. 2d 620 (Fla. 5th DCA 1999); *Hawke v. Broward National Bank of Fort Lauderdale*, 220 So. 2d 678 (Fla. 4th DCA 1969); *Matter of Caniglia*, 17 B.R. 858 (Bankr. M.D. Fla. 1982).

[101] 595 So.2d 180, 182-83 (Fla. 2d DCA 1992).

the escrowing of deeds in lieu.  When a default did occur, the borrower sought to invalidate the

deed that had been released from escrow.  The court emphasized that "all parties were

represented by counsel, the agreement arose from a pending foreclosure action, and the

transaction involves commercial real estate rather than residential property."[102]  The court

concluded that:

> "[t]he doctrine against clogging the right of redemption is not an absolute right.
> The courts have recognized that this doctrine of equity does not apply if the right
> is relinquished by 'a subsequent agreement upon a further consideration.'"[103]

In their Chapter 11 cases, the Debtors' relationship with PEPI would have been governed

by this Court.  If PEPI had concerns at the time that the escrow of deeds in lieu would be

unenforceable, it could have incorporated (or offered to incorporate) the Escrow Provision into

the loan documents with appropriate qualifying language, such as "subject to entry of an order by

the Bankruptcy Court barring Debtors from contesting the validity of any deeds released from

escrow," or some variation thereof.

The record shows no instance of this concern being raised by PEPI before the Default

Letter was sent.  The Debtors had no opportunity to address it.  Rather than working through

what concerns it may have had regarding the escrow of consent judgments, PEPI unilaterally and

repeatedly refused to include such provisions in the loan documents.[104]

Third, PEPI contends that its revision of the Waterfall Provision was justified because a

single foreclosure was required by Florida law − that multiple, sequential foreclosures would be

prohibited by doctrines of merger, estoppel or res judicata.[105]  Even where a mortgage is secured

---

[102] *Ringling*, 595 So.2d at 182.

[103] *Id.* (quoting *Stovall v. Stokes*, 94 Fla. 717, 741, 115 So. 828, 837 (1928).

[104] Doc. No. 102 at 33.

[105] Doc. No. 100 at 35.

by multiple properties, foreclosure of one will not bar later foreclosure of the other, except where the value of the land foreclosed in the first is sufficient to satisfy the debt.[106]  Further, the parcels in the waterfall were owned by several entities, which would have required multiple mortgages anyway.[107]

The record shows no instance where these legal issues were raised by PEPI before the Default Letter was sent.  The parties could have agreed, for example, to (a) make the sequential foreclosures subject to findings by the bankruptcy court that the Waterfall Provision was consistent with Florida law or (b) subject to the entry of one or more orders by the bankruptcy court modifying the automatic stay in phases, to permit parcel-by-parcel foreclosures as needed to pay off the loan balance after a default.  But, Debtors did not have the opportunity to propose methods to address these concerns.

Finally, PEPI contends that Debtors waived, or are equitably estopped from alleging, any default.  There is no evidence, however, of any express waiver by the Debtors.  Mr. Battista's comment in his February 17 email about the due diligence sign-off being the "only item remaining for us to be comfortable about filing," is not an express waiver.  In fact, he complained about PEPI's failure to provide conforming documents in another email later that day.[108]  Furthermore, the Default Letter was sent only four business days after the February 16 conference call.  Waiver generally does not arise merely from forbearance for a reasonable time.[109]

---

[106] Doc. No. 102 at 35 (citing *Prudence Co. v. Garvin*, 160 So. 7, 8 (Fla. 1935); *Waybright v. Turner*, 176 So. 424, 428 (Fla. 1937), *aff'd on rehearing*, 179 So. 412, 413-14 (Fla. 1938)).

[107] *Id.* at 34.

[108] *See* footnote 47, *supra*, and accompanying text.

[109] *See In re: B.J. Thomas, Inc.*, 45 B.R. 91, 95-96 (Bankr. M.D. Fla. 1984). S*ee also, e.g., Sundale, Ltd. v. Fla. Assoc. Capital Enter. Inc*., No. 11-20635-CIV, 2012 WL 488110 at *9 (S.D. Fla. Feb. 14, 2012) (no waiver found

PEPI maintains that Debtors are estopped because they continued to negotiate the Purchase Option after the February 16 conference call.  Although conduct may imply the intentional or voluntary relinquishment of a known right, such conduct must do so unequivocally.[110]  The continued discussions regarding the Purchase Option do not unequivocally demonstrate that the Debtors were willing to concede PEPI's removal of the Escrow Provision and its revision of the Waterfall.  There is nothing in the record to indicate that Debtors would have conceded the Escrow Provision and Waterfall language if PEPI had agreed to concede the general release and agree to the indemnification structure.

Debtors maintain that Mr. DiNardo actually was conferring with counsel.  This disputed issue of fact is not decisive, however.  PEPI did not change its position, nor was it misled to its prejudice by Debtors' actions after February 16.  Even if Mr. DiNardo's email is construed as untrue, PEPI was not misled.  It ceased work on the DIP Loan less than 24 hours later and conceded no substantive issues.  No substantial additional due diligence would have been necessary between February 16 and February 20.[111]  Debtors had paid PEPI's expenses.

The cases cited by PEPI are not applicable to this dispute.  Debtors here obtained nothing close to the benefits of the parties who were estopped from alleging a breach in those cases.[112]  Accordingly, PEPI's defense of equitable estoppel fails.[113]

---

based upon two and a half-year delay); *Kirschner v. Baldwin*, 988 So. 2d 1138, 1142 (Fla. 5th DCA 2008) (five-month delay insufficient to find implied waiver); *see also Air Prods. & Chem., Inc. v. Louisiana Land & Exploration Co.*, 867 F.2d 1376, 1380 (11th Cir. 1989) (applying Florida law in holding no clear waiver shown after five-year delay); *see also Mercede v. Mercede Park Italian Restaurant, Inc.*, 392 So. 2d 997 (Fla. 4th DCA 1981) (no waiver found after almost three-year delay).  Rather, an implied waiver requires conduct or a representation demonstrating an intent to relinquish a known right.

[110] *MDS*, 720 F.3d at 852 (internal citations omitted).

[111] In his affidavit, Mr. Fine states that PEPI verbally advised Debtors, before and during the February 16 conference call, that its due diligence had already been completed − that Debtors could go ahead and file.  Fine Aff. at ¶ 26(iv).

[112] In *Acosta v. District Board of Trustees of Miami-Dade Community College*, the court found that a student, who had satisfied all course requirements, paid a tuition increase, and graduated, was estopped from later declaring a

Based on the undisputed facts in the record, the Court concludes that:

1. Each of the parties was bound, per the explicit language of the Commitment Letter, to create and agree to final DIP Loan documents that "shall not contain additional terms, covenants, conditions, representations and warranties materially different than those required herein."[114]

2. The Commitment Letter obligated PEPI to incorporate into the DIP Loan documents the negotiated terms for the Escrow Provision, the related valuation mechanism, and the Waterfall Provision barring foreclosure against any property unless the lender had "first collect[ed]" from the prior properties on the list.

3. Debtors' attorney offered a procedure to defer resolution of the parties' disagreement regarding post-default lien enforcement until after the bankruptcy court's first interim approval, but PEPI did not agree with the "valuation/foreclosure" structure proposed by Debtors' counsel.  PEPI offered no alternative.  Debtors never agreed to abandon the Escrow Provision, the related valuation mechanism, or the Waterfall Provision, as set forth in the Commitment Letter.

4. The Escrow Provision, the related valuation mechanism, and the Waterfall Provision were not solely for PEPI's benefit.  Taken together, they represented a significant limitation on lien enforcement rights which was significant to Debtors and the Pre-Petition Lenders.  PEPI was not free to unilaterally discard or alter these provisions.

5. PEPI was advised multiple times, between February 10 and 17, of Debtors' imminent need to file their Chapter 11 petitions; but, PEPI repeatedly declined to incorporate the lien enforcement procedures to which it had agreed in the Commitment Letter.

6. As of February 16, 2010, the parties were not in agreement on how to work through the collateral after default, which was not resolved by the conference call or by the revised loan documents sent out by PEPI on February 17, 2010.

7. PEPI knew that Debtors had an urgent need for Chapter 11 relief.  PEPI also knew that Debtors were waiting on the final loan documents before they filed.  It is evident that PEPI's stance put Debtors, in the absence of the owner financing they utilized, in

---

breach of contract that included an agreement not to increase tuition.  905 So. 2d 226, 228-29 (Fla. 3d DCA 2005).  Similarly, in *Pretka v. Kolter City Plaza II, Inc.*, the court granted summary judgment on the defendant's equitable estoppel defense because the plaintiff waited at least three years to assert the breach of contract, continued to perform under the contract, negotiated new terms and made additional deposit payments, all of which the defendant relied upon in completing performance of the contract.  2013 WL 1192378 at *4-5 (S.D. Fla. Mar. 22, 2013).

[113] "Equitable estoppel requires that: (1) the party against whom estoppel is sought made a representation about a material fact that is contrary to a position it later asserts, and (2) the party seeking estoppel detrimentally relied on that representation."  *MDS*, 720 F.3d at 852.

[114] Blasnick Dep. Ex. 2 at 4.

the position of having to agree to PEPI's removal of the Escrow Provision and revised Waterfall procedure.

8. Once the parties were at impasse on how to work through the collateral after a default, and with time running out to file Chapter 11 petitions, Debtors were justified in declaring defaults regarding the Escrow and Waterfall Provisions and terminating negotiations.

9. The defenses asserted by PEPI regarding its repeated failure to include the Escrow Provision, and its alteration of the Waterfall Provision, are not persuasive.

## 2. The Due Diligence Sign-Off

Debtors repeatedly requested a "written due diligence sign-off" from PEPI before filing their Chapter 11 petitions.[115]  These requests were based on the parenthetical phrase in the Commitment Letter "(or such earlier date [after February 8] that is three business days after [PEPI] has advised [Debtors] it has completed its due diligence)."  According to the deposition testimony, PEPI understood that Debtors needed to know, before commencing their Chapter 11 cases, that PEPI had no open due diligence issues.[116]  It is also undisputed that during the February 16 conference call, PEPI advised Debtors that it would not provide a written due diligence confirmation even though its due diligence investigation was substantially complete.[117] It is undisputed that no such written notice was given until February 23, by Mr. Fine, after the Default Letter had been sent and the Chapter 11 petitions had been filed.

PEPI argues that the Commitment Letter did not expressly require a written due diligence sign-off before the Chapter 11 filings.  PEPI maintains that notification of completion of due diligence was a "condition precedent" to actual funding, which would only occur subsequent to the commencement of the Chapter 11 case.

---

[115] Lorio Dep. 91:2−14, 93:5−12, 94:7−13; Radunsky Dep. 103:10−104:25; Radunsky Dep. Exs. 28 and 29; Fine Dep. 95:1−18, 96:11−97:1, 99:1−9, 100:7−20; Fine Dep. Exs. 43−45.

[116] Blasnick Dep. 30:20−31:9; Fine Dep. 95:15−18; Radunsky Dep. 83:20−30.

[117] Lorio Dep. 149:24−150:8; Fine Aff. at ¶ 26(iv).

The Court views Mr. Fine's response to the Default Letter – "your formal three business day notice that due diligence has been completed…" – as an admission that such notice was for the benefit of the Debtors, as well as PEPI. Mr. Fine's response to the Default Letter also demonstrates that PEPI understood that such notice was an obligation arising from the Commitment Letter. PEPI's understanding of this obligation is further evidenced by the deposition testimony of Mr. Radunsky, PEPI's Chief Operating Officer and general counsel:

> Q.      Could the commitment terminate on February 8th, 2010, given the parenthetical that follows the February 2010 date?
>
> A.      I think if you read this in the following way it could and that would be on February 1st, if PEPI had given notice it had completed due diligence under this paragraph – had given that notice, and then by February 8th there wasn't a bankruptcy filing, then it would have terminated, I think.[118]
>
> Q.      Well, the reason I'm asking you that question is the only way the commitment could terminate on February 8, 2010 is if PEPI had given prior notice of completion of its due diligence, right?
>
> A.      **I think that's right. That's how I'm reading it now.**[119]

PEPI's position is also contrary to the language and purpose of the Commitment Letter. Even though the parenthetical phrase was placed within the "conditions precedent" section, the phrase itself called for a bankruptcy filing deadline, to be triggered by the written notice indicating that PEPI was ready to proceed with the DIP Loan. A written and dated notice was essential to establishing the expiration of PEPI's funding obligation – three business days after the notice was given.

From early in the process, the Debtors advised PEPI of the need for the written sign-off, as assurance that the DIP Loan was ready to go, before the Chapter 11 filings. As noted above,

---

[118] Radunsky Dep. 85:6−14.

[119] Radunsky Dep. 86:6−15 (emphasis added).

PEPI's on-going delay in giving the formal notice – even though its due diligence was satisfied – facilitated PEPI's withholding the lien enforcement restrictions without being subject to any deadline to restore them.  Thus, PEPI's advice on February 16 that it would not give this notice deprived the Debtors of a material element of performance.

PEPI's unequivocal refusal to provide the written confirmation that its due diligence was completed was a prospective breach of contract, releasing Debtors from any further obligations under the Commitment Letter. [120]  Therefore, the Debtors were justified in concluding, after the February 16 conference call, that it would not get the assurance of a ready lender to which it was entitled under the Commitment Letter.

PEPI argues that to establish the non-defaulting party's entitlement to damages, the non-breaching party must establish its ability to perform at the time of the breach.[121]  In this instance, the Debtors' performance, had the formal three-day notice been given, was only the voluntary election to file, or not file, for Chapter 11 by the third business day.  The record fully supports the conclusion that the Debtors were ready to file for Chapter 11 after February 16; but, the parties never came to an agreement on provisions for working through the collateral in a default scenario.  Therefore, the Court concludes that PEPI effectively repudiated its obligation to confirm the completion of due diligence prior to the Debtors' Chapter 11 filings.

---

[120] Doc. No. 102 at 44 (citing *Mori v. Matsushita Elec. Corp. of Am.*, 380 So.2d 461, 463 (Fla. 3d DCA 1980) ("A prospective breach of the contract occurs when there is absolute repudiation by one of the parties prior to the time when his performance is due under the terms of the contract. Such a repudiation may be evidenced by words or voluntary acts but the refusal must be distinct, unequivocal, and absolute.")).

[121] *Ryan v. Landsource Holding Co., LLC*, 127 So. 3d 764, 767-68 (Fla. Dist. Ct. App. 2013) (internal citations omitted).

C. PEPI's Motion for Partial Summary Judgment

PEPI denies that it unequivocally refused to do anything, but that it was still "chasing the deal" when, without warning, it received the Default Letter.[122]  PEPI requests partial summary judgment on Counts I (Breach of Contract) and III (Breach of the Covenant of Good Faith and Fair Dealing), arguing that it was Debtors who breached first by: (1) insisting on a new term – the written due diligence sign-off – as a condition precedent for the Debtors to file their Chapter 11 petitions; (2) failing to negotiate in good faith and obtaining a loan from another lender; (3) failing to provide PEPI with notice of the alleged default or opportunity to cure; and (4) negotiating with Gulf Bay in violation of the "non-disclosure" provisions of the Commitment Letter.[123]

1.  Written Due Diligence Sign-Off

PEPI argues that Debtors breached the Commitment Letter by insisting on a new term – the written due diligence sign-off – as a condition precedent for the Debtors to file their Chapter 11 petitions.  PEPI takes the position that the written due diligence sign-off was simply a condition precedent to funding, and that PEPI was not obligated under the Commitment Letter to provide a written due diligence sign-off prior to the Debtors filing for bankruptcy relief.

But, the written due diligence sign-off, which triggered the three business days Debtors had to file their bankruptcy petitions and extend PEPI's obligation to fund by another 90 days, was not Debtors' contrivance; it was in the Commitment Letter.  The Commitment Letter's expiration provisions only make sense with a prior written notice of due diligence completion, as the Court has determined above.  That Debtors raised the issue early in the process was not a

---

[122] Doc. No. 100 at 13-14.

[123] *Id.* at 22; Doc. No. 106.

breach; it was a legitimate document-based position.  Lastly, Debtors' repeated requests for a written due diligence sign-off bears no resemblance to a coercive tactic.  For these reasons, the Court rejects PEPI's contention.

2. <u>Duty to Negotiate in Good Faith and Fair Dealing</u>

PEPI asserts that Debtors' allegations of default were contrived as a "pretext" to give the deal to Gulf Bay, while avoiding the additional payments that would otherwise be due to PEPI following a termination of the transaction.  PEPI even suggests that the Debtors always intended to borrow from Mr. Ferrao, but needed a "failed" deal, with PEPI as the "foil," to argue in bankruptcy court that there was no alternative to the Gulf Bay Loan.

PEPI points to three items in the record in support of its position:

a) Mr. Fine's affidavit, in which he states that just prior to declaring default, "it appeared that the Debtors were reluctant to comply with the obligations of obtaining a release in favor of PEPI" as a condition of the Purchase Option;[124]

b) the deposition testimony of Mr. Ferrao stating that he had considered making the loan himself, from "early in the process;"[125] and

c) an excerpt from an email from Mr. Ferrao to Mr. Battista, on February 11, 2010: *"(2)* [J]*ane* [Houk] *knows what we need..i need to be able to purchase unequivocally."*

PEPI's contrived "default" theory is based primarily on Mr. Fine's supposition that the Debtors "appeared" to be "reluctant" to comply with the release provision of the Purchase Option.  But that is opinion, not a statement of fact.  The deposition testimony of both Mr. Ferrao and Mr. DiNardo was that Debtors were willing to give up on the indemnification proposal.[126]

---

[124] Fine Aff. at ¶ 6.

[125] Ferrao Dep. 30:2−16.

[126] Ferrao Dep. 44:2−11; DiNardo Dep. 55:2−21.

The Debtors have demonstrated a genuine dispute regarding the fact issues.  The deposition testimony raises doubt that the excerpt in the February 11 email was even about Mr. Ferrao being the lender or about the release.  The full email thread related to the excerpt, shows that the two points made by Mr. DiNardo related to (i) the trigger mechanism of the Purchase Option that needed to be added to make sure Mr. Ferrao had the right to exercise the option if he so desired, and (ii) a notice provision that would need to be added to make sure Mr. Ferrao had notice of the commencement of the 30-day window to exercise the purchase option if he so desired.[127]

According to Debtors, the discussions about the general release did not take place until a week after the email excerpt was generated, only when Debtors' attorney raised a concern over the ability of the Debtors to obtain bankruptcy court approval of the release.[128]  Also, it appears that Debtors would have accepted incorporation of the general release in the Purchase Option because Mr. Ferrao had other alternatives to preserve his equity in the project,[129] such as loaning money to the Debtors or an equity infusion to enable the Debtors to pay off the loan.[130]

Nevertheless, the Court concludes that there is no need to try these disputed factual issues.  PEPI cannot prove its assertion that the Debtors contrived the alleged defaults because of the Purchase Option dispute (or any other reason) because PEPI never tendered loan documents that conformed to the Escrow and Waterfall Provisions.  As this Court has concluded above, there was sufficient cause for the Debtors to declare the defaults and find another funding source.

---

[127] Doc. No. 113, Ex. B.

[128] Doc. No. 113 at 4; Fine Aff. at ¶19, Composite Ex. 4.

[129] Ferrao Dep. 44:2−11; DiNardo Dep. 55:2−21.

[130] Doc. No. 113 at 5 (citing DiNardo Dep. 224:24−225:2).  Mr. DiNardo testified that "[the general release] *was not a line in the sand for us. It was negotiated in the commitment letter. We accepted in the commitment letter. We accepted it now*."  Ferrao Dep. 224:24−225:2.

PEPI still defaulted under the Commitment Letter related to the Escrow Provisions, the Waterfall

Provision and the Due Diligence Sign-Off.

PEPI compares the Debtors to the borrower in *Teachers Insurance and Annuity Association of America v. Butler*,[131] who was held to be in breach because it refused to close unless the lender (Teachers) agreed to remove a prepayment penalty provision which had not been mentioned in the loan commitment.[132]  The lender alleged that the borrower's objection to the prepayment provision was simply a pretext for its unwillingness to go through with the loan because, as the evidence showed, the borrower could obtain a more favorable loan from other lenders.  The court found that the lender's inclusion of the new prepayment penalty was consistent with industry practice and that the borrower, who had waited nine months before raising any objection to the provision, had not negotiated in good faith.  Thus, its refusal to close, after refusing to negotiate the terms of the prepayment penalty, constituted a breach of the commitment letter.[133]

The Debtors here have not conducted themselves in any way like the borrower in *Teachers*.  There is no evidence that Debtors were "shopping" the loan to other lenders.  Debtors did not sit back and withhold their concern for nine months.  Here, the Debtors expended months of effort and paid nearly $1 million to PEPI, and an unstated amount of their own professional expenses.  The decisive fact that distinguishes this case from *Teachers* is that PEPI never

---

[131] 626 F. Supp. 1229 (S.D.N.Y. 1986).

[132] *Id.* at 1230-31.

[133] *Id*. at 1236 ("When they were unable to persuade Teachers to lower the interest rate agreed to in September 1982 and when they realized that Teachers was serious about living up to its commitments, defendants engaged in an eleventh hour comparison of the closing documents to the Commitment Letter to come up with an ostensible reason for not going forward with the loan.  Defendants breached the Commitment Letter and are obligated to Teachers for its damages.")

tendered loan documents that were in conformity with the lien enforcement restrictions of the Commitment Letter.

     <sub>3.</sub>  <u>Notice of Default and Opportunity to Cure</u>

PEPI argues that Debtors never gave PEPI notice of its alleged default, nor an opportunity to cure. The Commitment Letter is silent, however, as to such requirement. The course of dealing between the parties does not justify implying such requirement. The undisputed facts, summarized above, establish that Debtors repeatedly advised PEPI that removal of the Escrow Provision and revision of the Waterfall Provision were unacceptable. They declared PEPI in default within five days of determining that PEPI would not honor these material terms of the Commitment Letter. The Court will not read such a provision into the contract.[134]

Even after receipt of the Default Letter, even if it were construed as a notice of default, PEPI was still unwilling to agree to incorporate the Escrow and Waterfall Provisions as required by the Commitment Letter. PEPI was then only willing to agree to consider Debtors' proposed language and resume negotiations.

     4.  <u>"Truthful" and Non-Disclosure Provisions</u>

PEPI asserts that Debtors breached the "truthful" and "non-disclosure" provisions of the Commitment Letter[135] by disclosing the Commitment Letter and loan documents to Gulf Bay. PEPI cites to deposition testimony given by Mr. DiNardo, where he states that an email from

---

[134] The cases cited by PEPI in support of such an argument are inapplicable to the case at hand. Those cases deal with at-will employment and service agreements for an indefinite duration. Doc. No. 102 at 42 (citing, *e.g.*, *Leghorn v. Wieland*, 289 So. 3d 745, 748 (Fla. 2d DCA 1974); *Shell Oil Co. v. A.Z. Services, Inc.*, 990 F. Supp. 1406, 1415 (S.D. Fla. 1997).

[135] The Commitment Letter provides that: "Except as required by applicable law, this Commitment and the contents of it shall not be disclosed by the Company to any third party without the prior written consent of PEPI."

Gulf Bay to Mr. Battista regarding the comparison of the Gulf Bay Loan to the PEPI loan suggests that the Gulf Bay loan was based on the versions prepared with regard to PEPI.[136]

As Debtors' owner, Mr. Ferrao rightfully had on-going and intimate knowledge of the PEPI loan transaction. Mr. Ferrao also always had the right, as owner, to fund his companies during a Chapter 11. The deposition testimony supports the Debtors' position that Mr. Ferrao decided to be the lender only after the time for filing had come, and the parties could not reach an agreement on how to work through collateral in a default. It cannot be doubted that Debtors' legal team was fully capable of producing satisfactory documents for the Gulf Bay Loan without ever having gone through the months of negotiations with PEPI.

### 5. Breach of Implied Covenant of Good Faith

An implied covenant of good faith and fair dealing is a part of every contract.[137] "[A] party's good-faith cooperation is an implied condition precedent to performance of a contract; where that cooperation is unreasonably withheld, the recalcitrant party is estopped from availing himself of his own wrong doing."[138] The implied covenant of good faith and fair dealing is not an independent contract term.[139] Rather, it is a doctrine that modifies the meaning of all explicit terms in a contract, preventing a breach of those explicit terms *de facto* when performance is maintained *de jure*.[140] Florida courts have refused to allow a cause of action for breach of the implied covenant of good faith and fair dealing in two circumstances. First, where the party

---

[136] DiNardo Dep., Tr. II, 7:23−10:25, 18:7−19:7.

[137] *County of Brevard v. Miorelli Eng'g, Inc.,* 703 So.2d 1049, 1050 (Fla.1997).

[138] *Bowers v. Medina,* 418 So.2d 1068, 1069 (Fla. Dist. Ct. App. 1982).

[139] *Burger King Corp. v. Weaver*, 169 F.3d 1310, 1316 (11th Cir. 1999).

[140] *Alan's of Atlanta, Inc. v. Minolta Corp.,* 903 F.2d 1414 (11th Cir.1990) (applying Georgia law) (citations omitted).

alleged to have breached the implied covenant has in good faith performed all of the express

contractual provisions.[141]  Second, where the implied duty of good faith alleged to have been

breached would vary the express terms of the contract.[142]  The covenant may not be enforced

without the breach of an express term of the written contract.[143]  PEPI has not identified any

express term of the contract which the Debtors breached and, therefore, may not argue a breach

of the implied covenant of good faith and fair dealing.[144]

The record does not support PEPI's portrayal of Debtors as the saboteurs of the deal.

Debtors' management and lawyers spent months of effort negotiating the Commitment Letter

and to obtain final DIP Loan documents.  The email exchanges demonstrate an intense and

sincere effort by Debtors' management and lawyers to get to agreed forms of the DIP Loan

documents.  They responded to PEPI's due diligence needs, advised of their dissatisfaction

regarding the Escrow and Waterfall Provisions and the due diligence sign-off, and made

proposals to resolve these disputes.  Debtors and their professionals acted in good faith in the

negotiations of the Escrow Provision, Waterfall Provision, and Purchase Option.

For these reasons, the Court cannot conclude that Debtors breached the implied covenant

of good faith and fair dealing.

<u>CONCLUSION</u>

For the reasons stated above, the Court finds that PEPI defaulted under the Commitment

Letter by: (1) failing to include the Escrow Provision and related valuation mechanism in its

---

[141]  *Burger King,* 169 F.3d at 1316-17 (internal citations omitted).

[142]  *Id.*

[143]  Doc. No. 102 at 41 (citing *Meruelo v. Mark Andrew of the Palm Beaches, Ltd.*, 12 So.3d 247, 250-51 (Fla. 4th DCA 2009)).

[144]  *Id.* at 41-42 (citing *Flagship Resort Dev. V. Interval Intern., Inc.*, 28 So.3d 915, 924 (Fla. 3d DCA 2010)).

multiple drafts of the loan documents; (2) offering a material revision of the Waterfall Provision in those drafts; and (3) refusing to provide a written due diligence sign-off prior to before the Debtors had to file for Chapter 11.  PEPI breached the terms of the Commitment Letter when it advised, in the February 16 conference call, that it would not incorporate the required Escrow and Waterfall provisions into the final DIP Loan documents.  PEPI also anticipatorily breached its obligations under the Commitment Letter by stating its refusal to provide a written due diligence sign-off prior to the Chapter 11 filings.    As a result of PEPI's breach, the Debtors were relieved of any further performance under the Commitment Letter.

Additionally, the Court finds that PEPI's Motion for Summary Judgment should be denied because the evidence in the court record shows that PEPI is unable to prove that Debtors contrived defaults as a pretext to give the deal to Gulf Bay while avoiding the additional payments that would otherwise be due under the Commitment Letter.  Rather, the record supports the finding that the defaults alleged by Debtors were both real and material.

Accordingly, it is—

**ORDERED** that:

1.     The Debtors' Motion for Partial Summary Judgment and Incorporated Memorandum of Law (Doc. No. 84) is granted as to Counts I and II of the Complaint.

2.     PEPI's Motion for Partial Summary Judgement and Incorporated Memorandum of Law (Doc. No. 106) is denied as to Counts I and III of the Complaint.

3.     Debtors are relieved from all payment obligations under the Commitment Letter.

4.     PEPI shall turn over to the Debtors $405,000, representing one-half of the commitment fee, within 30 days of the date of entry of this memorandum opinion.

5.     All 28 claims filed by PEPI in the Debtors' jointly administered bankruptcy cases

are disallowed in their entirety.

6.     The Court reserves jurisdiction to consider additional damages, attorney's fees, and taxable costs, if any.

7.     The Court will hold a pre-trial conference on June 1, 2017 at 1:30 p.m. at the United States Bankruptcy Court, 801 North Florida Avenue, Courtroom 9B, Tampa, Florida, 33602, to determine if any issues remain to be tried and what further actions need to be taken on the issues of damages, attorney's fees, and costs in light of this Court's ruling.


Clerk's Office to serve.